412 S.E.2d 786

**Mary B. HOLSTEIN, Plaintiff Below, Appellee,**

v.

**Elborn HOLSTEIN, Defendant Below, Appellant.**

No. 19835.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1991.

Decided Dec. 19, 1991.

Dissenting Opinion of Justice Neely Dec. 20, 1991.

James M. Cagle, Charleston, for appellee.

Steven L. Miller, Deborah E. Reed, Steven L. Miller & Associates, L.C., Cross Lanes, for appellant.

MILLER, Chief Justice:

This is an appeal from a final order of the Circuit Court of Kanawha County, dated January 16, 1990, which granted the parties a divorce and effected a distribution of their property. The appellant, Elborn Holstein, asserts that the trial court erred in designating certain real property owned by the parties during the marriage as marital property instead of as his separate property and in reserving to the appellee, Mary B. Holstein, the right to receive alimony. We conclude that the circuit court's decision was correct, and we affirm the judgment of the lower court.

The parties were married in July of 1981 in Pearisburg, Virginia, and resided thereafter in London, Kanawha County. Each party was nearly 50 at the time of the marriage, and no children were born of the union. The parties separated on March 25, 1986, and on April 4, 1986, Mrs. Holstein filed for divorce.

I.

The key dispute in this case is the circuit court's characterization as marital property

of a farm in Pendleton County acquired by the parties during the marriage. Mr. Holstein claims that the funds used to purchase the farm came entirely from monies he received in settlement of a personal injury claim and should be considered separate property. Mr. Holstein's injury occurred before the marriage, but the settlement was not effected until March of 1983. Mr. Holstein immediately placed the settlement money, which amounted to approximately $77,000, in the parties' joint savings account. In June of 1983, Mr. Holstein placed approximately $82,000 of the savings account funds into joint certificates of deposit. Subsequently, on December 12, 1983, he placed $74,000 from the joint certificates of deposit into the joint savings account. In January of 1984, Mr. Holstein used the $74,000 in the joint savings account to purchase the farm, which was titled in the names of both parties.

■ We decline to discuss Mr. Holstein's claim that because the farm was purchased with money that came from the settlement of his premarital personal injury claim, it was his separate property.[1] Even if we assume that the entire settlement of $77,000 was his separate property when he first received it, his subsequent handling of it caused it to become marital property. His conduct demonstrates this point. When Mr. Holstein first received the funds, he placed them in the joint savings account. Several months later, he took the funds in the joint savings account and placed them into joint certificates of deposit. Six months after that, he cashed most of the certificates of deposit and placed these funds in the joint savings account.[2] The funds remained in the joint account for approximately one month, at which time Mr. Holstein used them to purchase the farm. Again, Mr. Holstein had the farm titled in both names. The farm was used for marital purposes for two years before the parties separated.

In Syllabus Point 3 of *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990), we recognized that the definition of "marital property" contained in W.Va.Code, 48–2–1(e)(1) (1986),[3] "expresses a marked preference for characterizing the property of the parties to a divorce action as marital property." We expressly disapproved the practice of tracing the source of the funds used for purchasing jointly titled property for the purpose of determining the character of such property.[4] Instead, we stated in Syllabus Points 4 and 7:

"4. Where, during the course of the marriage, one spouse transfers title to his or her separate property into the joint names of both spouses, a presumption that the transferring spouse intended to make a gift of the property to the marital estate is consistent with the principles underlying our equitable distribution statute.

\* \* \* \* \* \*

1. For a discussion of how a personal injury award is to be allocated between the spouses, see *Hardy v. Hardy*, 186 W.Va. 496, 413 S.E.2d 151 (1991).

2. It is apparent that the settlement funds became comingled to some extent with other marital funds in the joint account. The initial settlement of $77,000 was combined with joint funds to purchase certificates of deposit. Thereafter, Mr. Holstein cashed in certificates of deposit totaling $74,000 and placed the proceeds in the joint savings account. It was this amount that was used ultimately to buy the farm.

3. W.Va.Code, 48–2–1(e)(1) (1986), provided:

" 'Marital property' means:

"(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, except that marital property shall not include separate property as defined in subsection (f) of this section[.]"

The 1990 amendments to W.Va.Code, 48–2–1, did not alter this provision. *See* 1990 W.Va. Acts ch. 40.

4. In Syllabus Point 6 of *Whiting*, we stated: "The source of funds doctrine is ordinarily not available to characterize as separate property that property which has been transferred to joint title during the marriage."

"7. Under W.Va.Code, 31A–4–33 (1969), where separate funds are deposited in a joint account in the names of both husband and wife, such funds are presumed to be marital property for purposes of equitable distribution."

Here, it is clear that Mr. Holstein, on no less than four occasions, transferred the proceeds of his personal injury settlement into joint ownership with his wife. These transactions occurred over a nine-month period. There was no showing that Mr. Holstein made these transactions because he "was induced to do so by fraud, coercion, duress, or deception," factors which we indicated in *Whiting* would overcome the presumption of a gift to the marital estate. 183 W.Va. at 459, 396 S.E.2d at 421.

We recently discussed a similar situation in *Wood v. Wood*, 184 W.Va. 744, 403 S.E.2d 761 (1991). During the marriage, Mrs. Wood inherited some money which she placed in jointly titled bank accounts, certificates of deposit, and Treasury bills. Most of this money was later used as the downpayment on the Woods' jointly titled marital home. In response to Mrs. Wood's claim that the marital abode was her separate property, we stated: "Given that Mrs. Wood's inheritance had been placed in jointly titled investments before being used as the downpayment on the jointly titled marital house, we find that the circuit court's classification of the marital house as marital property was justified." 184 W.Va. at 751, 403 S.E.2d at 768.

Here, the facts are even more pronounced than in *Wood*. On four separate occasions, Mr. Holstein transferred the funds he now claims as separate property into joint bank accounts or jointly titled personal or real property, thereby evincing an intent to have the funds treated as marital property. No evidence was adduced below to overcome the presumption that Mr. Holstein intended to make a gift to the marital estate of the settlement of his personal injury claim.

While the circuit court's ruling came before our decision in *Whiting*, the court was nevertheless correct in concluding that the funds were marital property. We have repeatedly reaffirmed our adherence to the principle stated in Syllabus Point 3 of *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965):

"This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment."

*Accord McJunkin Corp. v. West Virginia Human Rights Comm'n*, 179 W.Va. 417, 369 S.E.2d 720 (1988); *Weirton Ice & Coal Co. v. Weirton Shopping Plaza, Inc.*, 175 W.Va. 473, 334 S.E.2d 611 (1985); *N.C. v. W.R.C.*, 173 W.Va. 434, 317 S.E.2d 793 (1984); *Chambers v. Sovereign Coal Corp.*, 170 W.Va. 537, 295 S.E.2d 28 (1982); *Environmental Prods. Co. v. Duncan*, 168 W.Va. 349, 285 S.E.2d 889 (1981); *Wilkinson v. Searls*, 155 W.Va. 475, 184 S.E.2d 735 (1971).

II.

Mr. Holstein also contends that the circuit court erred in granting Mrs. Holstein alimony in the amount of one dollar per year. The evidence below showed that Mrs. Holstein was a registered nurse who had been employed full-time both during and after the marriage, while Mr. Holstein retired from employment after the first year of the marriage. At the time of the final order, Mrs. Holstein was almost 59 years old. Mr. Holstein was one year older, and his health was characterized as only fair due to his personal injury.

Mrs. Holstein, on the other hand, had suffered from breast cancer in 1984, and at the time of the final hearing, it was unclear whether she would be able to obtain health insurance. The circuit court ruled that while there was no immediate basis for awarding Mrs. Holstein alimony, a substantial change in her health might warrant a support award. The court granted Mrs. Holstein token alimony for the expressed purpose of reserving the court's jurisdiction to grant additional support in the future.

The award of a nominal or token amount of alimony is an attempt to avoid the harsh consequences that sometimes result from making no alimony award. W.Va.Code, 48–2–15(e) (1986), gives a circuit court which has made an initial award of alimony continuing jurisdiction to modify such award upon a showing of altered circumstances.[5] This provision does not, however, specifically authorize the court to make an initial award of alimony after entry of the final decree.

Earlier versions of W.Va.Code, 48–2–15, authorized the court to modify alimony awards.[6] However, we have customarily held that under such a statutory provision, if the court did not initially award alimony in the final decree, it could not at a later time make an alimony award. In *Savage v. Savage,* 157 W.Va. 537, 203 S.E.2d 151 (1974), a decree was entered without provision for alimony, and the wife attempted some four months later to have it altered to provide for alimony. In rejecting this claim, we said:

> "This matter is discussed in 24 Am. Jur.2d *Divorce and Separation,* § 658, in the following language: 'Statutory power to modify a decree for permanent alimony does not inferentially authorize the court to award alimony after divorce where none was given by the decree. To allow alimony subsequently to the decree would amount to an original and new judgment, not a modification; alteration can be made only of something then in existence.'" 157 W.Va. at 539, 203 S.E.2d at 152.

We concluded in the Syllabus of *Savage:*

> "Where a final divorce decree made no award of alimony, the divorce decree cannot be subsequently modified to grant alimony."

*See also Zinn v. Zinn,* 164 W.Va. 142, 260 S.E.2d 844 (1979); *Childress v. Childress,* 156 W.Va. 839, 196 S.E.2d 657 (1973); *Farley v. Farley,* 149 W.Va. 352, 141 S.E.2d 63 (1965). While we approved the trial court's decision not to grant alimony in *Caraway v. Caraway,* 183 W.Va. 225, 395 S.E.2d 225 (1990), in note 2 we recognized the rule stated in *Savage,* 183 W.Va. at 229, 395 S.E.2d at 229.

In order to avoid depriving a spouse of the right to obtain alimony in the future if there is a need for it, courts have approved the practice of awarding a nominal amount of alimony in the final decree so as to retain the jurisdiction to alter the award.[7] *See, e.g., Becker v. Becker,* 262 N.W.2d 478 (N.D.1978); *Schwandt v. Schwandt,* 471 N.W.2d 176 (S.D.1991). *See generally* 2 H. Clark, *The Law of Domestic Relations in the United States* § 17.4 (2d ed.1987); 27B C.J.S. *Divorce* § 432 (1986). Such awards have been approved where there is some uncertainty about one spouse's present or future finances, health, or ability to work. *See Marriage of Winick,* 89 Cal.App.3d 525, 152 Cal.Rptr. 635

---

**5.** W.Va.Code, 48–2–15(e) (1986), entitled "Relief upon ordering divorce or annulment or granting decree of separate maintenance," states, in pertinent part:

> "At any time after the entry of an order pursuant to the provisions of this section, the court may, upon the verified petition of either of the parties, revise or alter such order concerning the maintenance of the parties, or either of them, and make a new order concerning the same, as the altered circumstances or needs of the parties may render necessary to meet the ends of justice[.]"

The subsequent amendments to W.Va.Code, 48–2–15, did not substantially alter this provision. *See* 1991 W.Va. Acts ch. 46; 1990 W.Va. Acts ch. 40.

**6.** W.Va.Code, 48–2–15 (1980), contained this provision:

> "[T]he court may, from time to time afterward, on the verified petition of either of the parties, revise or alter such order concerning the maintenance of the parties, or either of them, and make a new order concerning the same, as the altered circumstances or needs of the parties may render necessary to meet the ends of justice[.]"

**7.** Many courts have apparently done away with the fiction of a nominal alimony award, holding that the court can also retain jurisdiction without an award of alimony by an express reservation in the final decree. *See, e.g., Becker v. Becker,* 262 N.W.2d 478 (N.D.1978); *Kronforst v. Kronforst,* 21 Wis.2d 54, 123 N.W.2d 528 (1963). *See generally* Annot., 43 A.L.R.2d 1387, 1409–10 (1955) (decree without alimony award as precluding later award); 24 Am.Jur.2d *Divorce & Separation* §§ 685, 689 (1983); 27B C.J.S. *Divorce* § 432 (1986).

(1979); *In re Marriage of Boseman*, 31 Cal.App.3d 372, 107 Cal.Rptr. 232 (1973); *Ridolfi v. Ridolfi*, 178 Conn. 377, 423 A.2d 85 (1979); *Aycock v. Aycock*, 498 So.2d 999 (Fla.App.1986); *In Re Marriage of Horstmann*, 263 N.W.2d 885 (Iowa 1978); *Metcalf v. Metcalf*, 28 Mich.App. 442, 184 N.W.2d 560 (1970); *Bell v. Bell*, 641 S.W.2d 854 (Mo.App.1982); *Richardson v. Richardson*, 524 S.W.2d 149 (Mo.App.1975); *Burg v. Burg*, 1 Wis.2d 419, 85 N.W.2d 356 (1957). The award of a nominal amount of alimony is a matter within the sound discretion of the trial court. *See Alcalay v. Alcalay*, 200 Cal.App.2d 820, 19 Cal.Rptr. 649 (1962); *Ridolfi v. Ridolfi, supra; Richardson v. Richardson, supra; Lee v. Lee*, 744 P.2d 1378 (Utah App.1987). *See also Rose v. Rose*, 176 W.Va. 18, 340 S.E.2d 176 (1985); *Nichols v. Nichols*, 160 W.Va. 514, 236 S.E.2d 36 (1977). The circuit court is required, however, to make the reasons for such an award clear in its written findings and conclusions. *See Becker v. Becker, supra; Hansen v. Hansen*, 259 Wis. 485, 49 N.W.2d 434 (1951); *Lee v. Lee, supra. See also Burger v. Burger*, 176 W.Va. 416, 345 S.E.2d 18 (1986); *Witte v. Witte*, 173 W.Va. 281, 315 S.E.2d 246 (1984).

■ Thus, we conclude that the circuit court has authority to award nominal alimony to a spouse in order to reserve the court's jurisdiction to award additional alimony if needed. Ordinarily, such an award should be given when there is some uncertainty about the spouse's future earnings, financial condition, or health. In awarding such nominal alimony, reasons should be given to justify such award.

■ Here, the circuit court found no basis for granting alimony at the time of the final decree. The court also recognized, however, Mrs. Holstein's previous bout with cancer and the fact that she was having difficulty obtaining health insurance. In view of these circumstances, we conclude that it was appropriate for the trial court to retain jurisdiction by awarding Mrs. Holstein nominal alimony in the event of a future change in her health. *See In re Marriage of Boseman, supra.*

The circuit court offered sufficient findings and conclusions to support the award of nominal alimony. Consequently, we cannot say that the court abused its discretion in granting Mrs. Holstein one dollar per year in alimony.

### III.

For the reasons stated above, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

NEELY, Justice, dissenting:

Mr. and Mrs. Holstein married in 1981 when each was almost 50. Instead of insisting upon pages and pages of premarital agreements and careful separation of bank accounts, the Holsteins acted like a family. When Mr. Holstein received a settlement from a personal injury claim that occurred before the marriage, he placed it into a joint account instead of sedulously protecting it as *his* separate property.[1] My previous complaints seem to have fallen on the majority's deaf ears, but I will keep trying. *See Charlton v. Charlton*, 186 W.Va. 670,

---

1. The majority declines to discuss Mr. Holstein's claim that "because the farm was purchased with money that came from the settlement of his premarital personal injury claim, it was his separate property." Slip op. at 2. This clearly falls under the definition of separate property in W.Va.Code, 48–2–1(f)(4) [1990]. Of course, the majority has long since stopped citing *W.Va. Code*, 48–2–1(f) [1990] for fear that it might get in the way of further "interpretations" of *Whiting*.

For the record, *W.Va.Code*, 48–2–1(f) [1990] provides:

(f) "Separate property" means:

(1) Property acquired by a person before marriage; or

(2) Property acquired by a person during marriage in exchange for separate property which was acquired before the marriage; or

(3) Property acquired by a person during marriage, but excluded from treatment as marital property by a valid agreement of the parties entered into before or during the marriage; or

(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution; or

(5) Property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance; and

413 S.E.2d 911 (1991) (Neely, J. dissenting); *Koontz v. Koontz,* 183 W.Va. 477, 481, 396 S.E.2d 439, 443 (1990) (Neely, J. dissenting); *Whiting v. Whiting,* 183 W.Va. 451, 464, 396 S.E.2d 413, 426 (1990).

Imagine Mr. X and Ms. Y, each 50 years of age, preparing to marry one another. Mr. X has $50,000 in various bank accounts that he has acquired through the course of his life. Ms. Y owns a house, with 10 years left on the mortgage, in which she has accrued $50,000 in equity. Mr. X's know-it-all friend, Mr. Z, takes him out to dinner one night and tells him all about this Court's previous decision in *Whiting* and its progeny. He gets Mr. X all upset about the gold-digging Ms. Y. Thereafter, Mr. X insists upon keeping his $50,000 in separate bank accounts. Ms. Y, then, insists on a written agreement providing that the house is her separate property. Now, instead of looking forward to a lifetime of happy marriage, the parties must bring in their lawyers and negotiate over who owns what. This is not fiction but the reality that the majority's opinions have created.

*Whiting v. Whiting* must be overruled!

(6) Any increase in the value of separate property as defined in subdivision (1), (2), (3), (4) or (5) of this subsection which is due to inflation or to a change in market value resulting from conditions outside the control of the parties.